Harold A. MILLER, Jane S. Miller, Joanne Miller Lilley, Prudence M. Miller, also known as Prudence Miller, Achsah Jane Graham, Individually and as Trustees, Stimson Lumber Company, Rellim Redwood Co. and Miller Redwood Company

v.

The UNITED STATES.

No. 296–74.

United States Court of Claims.

April 16, 1980.

---

**814**

Manley B. Strayer, Portland, Or., attorney of record for plaintiffs. Stoel, Rives, Boley, Fraser & Wyse and Tonkon, Torp & Galen, Portland, Or., of counsel.

Howard O. Sigmond, Washington, D. C., with whom was Asst. Atty. Gen., James W. Moorman, Washington, D. C., for defendant.

Richard Murray, Washington, D. C., for Jane W. Bodington, et al., amici curiae. Angelo A. Iadarola, Washington, D. C., for Georgia-Pacific Corp., amicus curiae. McCutchen, Doyle, Brown & Enersen, W. Scott Burke, San Francisco, Cal., and Wilkinson, Cragun & Barker, Washington, D. C., of counsel.

Before KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

BENNETT, Judge:

This case comes before the court on plaintiffs' exceptions to the recommended decision of Trial Judge Thomas J. Lydon, filed May 30, 1979, pursuant to Rule 134(h). Plaintiffs' claim arises from the taking of some 2,646.22 acres from an area known as the Mill Creek tract, owned by the individual plaintiffs,[1] for inclusion in Redwood National Park in Del Norte and Humboldt Counties, California. This was a legislative taking pursuant to Pub.L. No. 90–545, approved October 2, 1968, 82 Stat. 931, 16 U.S.C. § 79a *et seq.* (1976).

Defendant has already paid plaintiffs $11,687,955, plus simple interest thereon at the rate of 6 percent per annum, to compensate them for the taking of their entire property and to stop the running of interest on the amount paid. At trial plaintiffs maintained that the amount paid was not adequate compensation for the taking. The principal valuation disputes between the

---

1. The individual plaintiffs, sometimes referred to as "the Miller family," are Harold A. Miller, his wife Jane S. Miller, and their daughters Prudence M. Miller, Achsah Jane Graham, and Joanne Miller Lilley. The Miller family owned the taken lands as tenants-in-common with specified, by percentages, undivided interests. The California corporate plaintiffs are Stimson Lumber Company (Stimson), Miller Redwood Company (Miller Redwood), and Rellim (Miller spelled backwards) Redwood Company (Rellim). Stimson owned all the outstanding stock of Miller Redwood and Rellim. The Miller family owned almost 75 percent of the outstanding stock of Stimson. Harold A. Miller and his wife Jane S. Miller, as trustees, controlled some 22 percent of the remaining outstanding Stimson stock, under a trust in which the sole beneficiary was Jane S. Miller. The corporate claims herein are for severance damages only.

parties involved the value of the old-growth redwood timber and whether any severance damages were incurred by plaintiffs. The parties stipulated at trial that the fair market value of all land, improvements, and timber other than old-growth redwood timber taken from plaintiffs was $2,981,881.80. With respect to the unresolved issues, the trial judge found that:

(1) the fair market value of the old-growth redwood timber taken from the individual plaintiffs was $10,918,376;

(2) no severance damages were incurred as a result of the taking;

(3) the 6-percent interest rate fixed by Pub.L. No. 90–545 for the delay in payment of just compensation was an appropriate rate of interest; and

(4) plaintiffs were not entitled to recover litigation expenses under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Pub.L. No. 91–646, 91st Cong., 2d Sess., approved January 2, 1971, 84 Stat. 1894, 42 U.S.C. § 4651 (hereinafter Uniform Relocation Act).

Upon consideration of the exceptions, briefs, and oral argument of counsel, and after review of all the evidence, we find that the trial judge was correct in his conclusions with respect to the fair market value of the old-growth redwood timber taken, and in the denial of severance damages and litigation expenses. With respect to the appropriate rate of interest due as just compensation for delay in payment, we have determined that the 6-percent rate per annum set as a minimum by Pub.L. No. 90–545 would not be appropriate in this case.[2]

I

The families of both Harold A. Miller, the patriarch plaintiff, and his wife, plaintiff Jane S. Miller, were in the timber business, principally in the State of Oregon, prior to their marriage in 1929. Jane S. Miller was the daughter of the founder of the Stimson Lumber Company (Stimson), also a plaintiff herein. In the 1930's the families decided to purchase timberlands in northern California in an effort to establish an independent timber source for lumber operations. Timberland purchases in Del Norte County, California, began in 1942 and continued into the mid-1960's. As of October 2, 1968, the individual plaintiffs, see note 1 supra, owned some 19,390 acres, known as the Mill Creek tract, as tenants-in-common with individual interests of each specified by percentages, e. g., Harold A. Miller had, as a tenant-in-common, an undivided interest of 48 percent in the Mill Creek tract. Harold A. Miller and others owned additional tracts of timberland in Del Norte County as of October 2, 1968.

Rellim Redwood Company (Rellim), a California corporation and a plaintiff herein, was established in 1955 to manage, harvest, and sell the timber from the timberlands in Del Norte County owned by the individual plaintiffs under contractual arrangements, amended from time to time, which spelled out the rights, liabilities, and obligations of the individual and corporate parties. As of October 2, 1968, almost all of the timber harvested by Rellim was sold as logs to Miller Redwood Company (Miller Redwood). The individual plaintiffs were paid by Rellim when timber was harvested from the Mill Creek tract. Harold A. Miller has been president of Rellim at all times material herein.

Miller Redwood, a California corporation and a plaintiff herein, was established sometime in the early 1960's. In that time period, the individual plaintiffs transferred some 102.33 acres of land, located in the midst of the Mill Creek tract, to Miller Redwood for the purpose of constructing a sawmill and other lumber manufacturing facilities. A sawmill was constructed in 1964 and a veneer plant was constructed in

2. We adopt without modification the trial judge's findings of fact which are not printed with this opinion, but which have been furnished to the parties. We have also adopted, and used herein, substantial parts of the trial judge's opinion. Any additional statements of fact in this opinion are also made a part of our findings. The opinion contains the facts sufficient to reach the judgment.

1967, although the necessary steam vats for the plant were not completed until mid-1968. As of October 2, 1968, Miller Redwood obtained its entire supply of logs from the timberlands of the individual plaintiffs through Rellim and manufactured those logs into lumber, veneer, or other forest products. Harold A. Miller has been president of Miller Redwood at all times material herein.

Stimson, an Oregon corporation, was established in 1930. As indicated earlier, Stimson owned all of the outstanding stock of both Rellim and Miller Redwood and the individual plaintiffs owned and/or controlled some 97 percent of Stimson outstanding stock as of October 2, 1968. The profits of both Rellim and Miller Redwood inured to the benefit of Stimson. The profits of Stimson were paid to its shareholders who were predominantly the individual plaintiffs herein. Harold A. Miller was, at all times material herein, president and chairman of the board of directors of Stimson.

Immediately prior to October 2, 1968, the individual plaintiffs owned some 21,305.15 acres of timberlands in Del Norte County, California, of which some 8,248.87 acres contained old-growth redwood timber. Timber more than 100 years old is classified as old-growth timber. Pub.L. No. 90–545 took 2,646.62 acres of forest lands from the individual plaintiffs, of which 876.57 acres contained old-growth redwood timber. The taken acreage was located on the northern portion of the Mill Creek tract.

The taken lands were located southeast of, and in close proximity to, Crescent City, California, and U.S. Highway 101. These lands contained both high quality paved roads and poorly maintained dirt roads. The topography of the land ranged from 200 feet above sea level along Mill Creek, a body of water running through the area, to over 1,500 feet above sea level in the northeast area. The taken lands contained a variety of timber species, the most important of which was coastal old-growth redwood (known as sequoia sempervirens). These lands contained virgin timbered areas, cutover areas, second-growth areas, and residual timbered areas.

Roughly 500 acres of the timbered area taken support stands of large old-growth redwood timber. Nearly 100 of these 500 acres contain stands of extra large-sized, old-growth redwood trees. Generally these large-sized trees are located on the flats bordering Mill Creek, about 1 mile north of the Miller Redwood sawmill, veneer plant, and manufacturing facilities. This 100-acre area was approximately 3 miles from U. S. Highway 101 and was accessible by means of a main access road. Large numbers of old-growth redwood trees in this 100-acre area are over 100 inches in diameter and some of these trees are over 300 feet in height. The largest old-growth redwood tree measured 202 inches in diameter, and the tallest tree was over 330 feet in height. In terms of timber volume, i. e., thousand board feet (MBF) per acre, the stands in this 100-acre area averaged higher than any other old-growth redwood timber stand included within Redwood National Park. Defendant's timber experts readily admitted that this 100-acre area contained some of the best old-growth redwood timber in existence. The old-growth redwood timber on the remaining areas of the taken lands generally was smaller in size, but some good-sized trees were in those areas as well. On the whole, the old-growth redwood timber taken from the individual plaintiffs was of very high quality.

As of October 2, 1968, it is conceded that the highest and best use of the lands taken from the individual plaintiffs was timber crop production. There is also no dispute about the fact that the fair market value of the taken timber must be determined as of October 2, 1968. *United States v. Miller*, 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943).

The parties engaged private consulting firms to determine the volume and the fair market value of the old-growth redwood timber taken from the individual plaintiffs and to determine whether plaintiffs, individual and corporate, incurred severance damages as a result of this taking. Plain-

tiffs engaged the firm of Mason, Bruce & Girard (MBG), Consulting Foresters, whose principal office was located in Portland, Oregon. Defendant engaged the firm of Hammon, Jensen, Wallen, & Associates (HJW), whose principal office was located in Oakland, California. Both of these firms were well known in the forest industry and both were well qualified to offer opinions on forestry matters, including, but not limited to, the determination of timber volume and fair market value.

MBG had its beginning in 1923 as a partnership. It has remained a partnership to this day. In the 1940's the firm name of MBG was established. The firm had extensive experience in all facets of forestry matters. Over the years, the MBG firm was innovative in the forest mensuration area, in the area of cruising forest lands, and in the area of sustained yield production programs. While the MBG firm had been involved in some transactions involving redwood timberlands in California, the record indicates that the greater portion of the firm's interest and activities was involved with timberlands and tree species other than redwood.

HJW was established as a partnership in 1949, but at the time of trial it had been incorporated. For over 25 years this firm offered a broad range of consulting services dealing with forest lands and the forest industry. The firm had extensive experience in the redwood region and with the redwood industry. It has managed, and continues to do so, redwood timberland properties on behalf of clients. The firm prepared a resource study in 1966–67 on redwood timberlands in California for the Federal Government for use by Congress in its consideration of the establishment of a Redwood National Park. HJW cruised all the timberlands included in the park as established.

The MBG appraisal report directed at the taking here in question was prepared and signed by Lucien B. Alexander (Alexander), a partner in the MBG firm. Alexander obtained a bachelor's degree in forest management in 1940 from Oregon State University. Prior to and subsequent to World War II, he worked for the United States Bureau of Land Management (BLM) in various capacities, e. g., cruising, land appraisals, forester. In 1948, he became Regional Forester (Oregon, Washington, Idaho) in charge of timber management for BLM. He left BLM in 1953 to accept a job with MBG, and became a partner in that firm in 1955. The list of forestry-related transactions and projects in which Alexander has been involved since joining MBG is extensive, and embraces both large and small transactions. He has also had responsibility for managing tracts of timberlands, predominantly fir and hemlock. Alexander has also written articles on various forestry topics. He is considered by some to be the eminent authority in the field of variable plot cruising. Alexander is a member of the Society of American Foresters and a licensed real estate broker in the State of Oregon. Alexander had considerable experience in forestry consulting work. He is certainly qualified to express opinions relating to timber volume predictions and timber valuation. However, his experience in the redwood region, and with redwood timber in particular, was not extensive. Of some 200 forest cruise and/or estimating transactions and projects he was involved in since joining MBG, only three involved redwood timberlands. In 1955, he cruised a second-growth redwood stand, and again in 1955 he provided a quick volume estimate, or prediction, of residual old-growth redwood timber relative to a proposed sale. In 1961, he was involved in a second-growth redwood cruise. In 1974, Alexander became involved in the appraisal of plaintiffs' taken redwood timberlands. Other members of the MBG firm, such as Robert J. Knepper (Knepper), a firm partner since 1967, and Harold Whitehead, head cruiser, had input relative to Alexander's appraisal report effort.

The HJW appraisal report was prepared by Paul R. Kevin, Jr. (Kevin), although signed by Arnold F. Wallen (Wallen) on behalf of HJW. While Kevin had primary responsibility for the appraisal report, other members of the firm, principally Wallen, Herbert Jensen (Jensen), a founding part-

ner and firm principal, and Reed Pratt (Pratt), a timber cruising and inventory specialist with the firm, had input relative to the appraisal report. Kevin obtained a bachelor's degree in forestry from the University of California in 1955, and thereafter went to work for HJW. He was still with HJW at the time of trial. Kevin has worked in the redwood region since 1955 in all facets of forest activities, e. g., cruising, scaling, appraisal of land and/or timber, aerial photo interpretation, etc. He had extensive redwood cruising experience and was involved in a number of appraisals of redwood lands and timber. At the time of trial, Kevin had applied for membership in the American Institute of Real Estate Appraisers (MAI). Kevin is considered qualified to offer opinions on old-growth redwood timber volume and value.

Wallen went to work for the United States Forest Service in 1938 in northeastern California as a timber cruiser and scaler. Several years later, he went to work for the State of California as an assistant game warden. In 1944, he transferred to the state's Division of Forestry where he worked initially as a forest ranger and later as a forest technician in the redwood region. Wallen was appointed the first secretary of the Redwood Forest Practices Committee. This committee was charged with establishing forest practice rules regulating timber operations in the redwood forests in California. Such rules were adopted by the State of California in 1945. In 1949, Wallen, together with Jensen and Lonnie Hammon, formed the HJW partnership. Thereafter, HJW cruised, at one time or another, most of the major redwood timberland ownerships in the redwood region. Wallen was experienced in all facets of redwood timber operations from cruising and appraising timberlands to management of said lands on behalf of clients. Wallen had much

more experience and knowledge about the redwood region and about redwood timber than any of the experts or other witnesses who testified in this case. He is licensed as a professional forester by the State of California, and is a member of the Society of American Foresters, the American Forestry Association, and the Consulting Foresters Association. He was eminently qualified to express opinions as to redwood timber volume predictions and valuation and redwood timber matters in general.

While both the MBG and HJW firms were competent and qualified to render opinions on forestry matters, including but not limited to timber volume and valuation, the extensive and continuous experience and expertise in the redwood region and with redwood timber of the HJW personnel who testified in this case overshadowed the redwood experience of the MBG personnel who testified. This fact was a persuasive element in the conclusions reached by the trial judge on timber matters upon which the experts, who have spent their entire professional lives in forestry activities, could not agree.

II

The initial issues to be resolved are the determinations of the volume and the value of the old-growth redwood timber taken from the individual plaintiffs. These are basically factual questions centering on the opinions of the forestry experts engaged by the parties. See in this regard *Seminole Indians of Florida v. United States*, 197 Ct.Cl. 350, 361, 455 F.2d 539, 545 (1972). A. *Volume of Old-Growth Redwood Timber.*

Plaintiffs contend that the volume of old-growth redwood timber taken from them was 138,223 MBF net Scribner log rule or scale.[3] Defendant maintains that the vol-

---

**3.** Scaling measures the number of board feet of lumber in a log. The measuring standard used in scaling logs is a log rule which estimates or predicts the volume of lumber that will be obtained from a log of a given diameter and length. There are a variety of log rules utilized in the forest industry. Confusion and uncer-

tainty have been engendered in this record because plaintiffs utilized a net Scribner scale in predicting volume and defendant utilized a Humboldt scale in estimating volume. Plaintiffs attempted to place both timber volume figures on the same plane by developing a "Humboldt-by-conversion" log rule or scale

ume of taken old-growth timber was 112,-936 MBF Humboldt log rule or scale.[4] Both parties used short log measurements.

In determining the volume of lumber present in standing trees, it is necessary to conduct a cruise of the timberlands in question. A cruise is a field investigation of forest lands to obtain tree data sufficient to enable one, with the help of a volume table, to predict the volume, in board feet, of the lumber that would be produced as a result of logging and sawing the timber on said lands. Plaintiffs and defendant conducted independent cruises of the taken lands. Their cruise procedures and techniques varied. For example, MBG utilized the variable-radius plot or prism cruising method

whereas HJW used the fixed-radius plot cruising method.

Each side criticizes the cruise efforts of the other. Plaintiffs suggest that their cruise was conducted by MBG's most experienced cruiser [5] whereas defendant's cruise was carried out by inexperienced cruisers.[6] The record establishes that cruising forest lands is not an exact science. Two different cruises of the same forest land often produce different volume results. Yet, each cruise result may in and of itself be acceptable for a given purpose.

(1) *Gross Merchantable Volume*

In this case the gross (not net) volume determination of each cruise was relatively

---

based on studies conducted by Rellim designed to establish a defect ratio between Scribner scale and Humboldt scale relative to plaintiffs' redwood timberlands. Plaintiffs' "Humboldt-by-conversion" scale produced a volume figure of 119,445 MBF which plaintiffs suggest can be used for comparison purposes with defendant's net volume figure. However, this "Humboldt-by-conversion" scale is, in essence, a form of Scribner scale and does not provide a basis for reasonable comparison with the standard Humboldt scale utilized by defendant.

4. The Humboldt log rule is really a scale of averages and is designed to account for the internal defect experience has shown exists in old-growth redwood trees. Since these internal defects are generally not discoverable until the log is being processed at the mill, the Humboldt log rule, an arbitrary scale, was utilized to account for internal defect when predicting the volume of lumber in standing trees. This log rule assumed that 30 percent of the merchantable logs in a tree would contain internal defects. In essence, the Humboldt log rule was simply 70 percent of the gross merchantable Scribner scale. While the volume of old-growth redwood in the redwood region, as of October 2, 1968, was generally expressed in Humboldt scale, i. e., 30-percent volume deduction for internal defects, buyers and sellers of old-growth redwood at this time used other percentages, i. e., 24 percent or 27 percent, etc., if studies or experience indicated that the internal defects in particular stands of redwood were less than 30 percent. If an internal defect percentage lower than 30 percent was used, the volume result was no longer expressed in Humboldt scale but was expressed in net Scribner or net Spaulding scale. Scribner and Spaulding scales are considered comparable for purposes of this litigation.

5. Defendant counters with the observation that Harold Whitehead, MBG's experienced cruiser, had not cruised redwood timber since 1955, prior to cruising the taken lands in 1969. Further, defendant stresses the fact that Whitehead cruised the taken lands with a prism and it was the first time he had cruised redwood timberlands with a prism. Whitehead discovered, early in his cruise efforts, that his use of a 40-factor prism was incorrect and he accordingly shifted to a 66-factor prism. Finally, defendant notes that MBG incorporated into its cruise a new concept (the MH/5 factor) for dealing with trees containing 5 or more logs. This was Whitehead's first experience with this factor and the record suggests its reliability relative to redwood timber was as yet uncertain. Defendant also notes there was no check cruise of Whitehead's cruise by other cruisers.

6. HJW's cruise method was described as a "cookbook" cruise. HJW utilized college forestry majors, for the most part, indoctrinated them with a 2-week training program, and had them cruise the redwood timberlands under the supervision of experienced and able HJW cruisers. The on-the-job training for these cruisers took place on plaintiffs' taken lands. Every effort was made to eliminate the need for these cruisers to make subjective judgments. Judgments in critical areas, e. g., merchantable height, breakage, etc., were made by experienced HJW personnel on the basis of redwood industry experience. The cruise efforts of the HJW cruisers were subjected to check cruises by experienced Forest Service cruisers to insure that the HJW cruise was conducted properly and that the results obtained were reasonable. HJW used this "cookbook" cruise method on a number of occasions with satisfactory results and HJW had complete faith in the reliability of such cruise results.

close.[7] In calculating the gross volume of *merchantable* logs, however, the two cruises reached different conclusions. HJW calculated the gross Spaulding volume of merchantable logs to be 159,758 MBF. MBG's estimate of the gross volume of merchantable logs was 164,713 MBF Scribner scale.

The trial judge was persuaded by the more extensive redwood experience and better testimonial presentation of the HJW personnel that the HJW volume figure was the more appropriate starting point. Plaintiffs argue that the volume determinations of both HJW and MBG depend on the expertise of their cruises rather than other personnel and that MBG's cruiser was clearly more experienced than the college forestry majors used by HJW. There was evidence in the record bringing into question the familiarity of MBG's cruiser with the cruising method which he used on this occasion. *See* note 5 *supra*. In addition, the HJW cruisers were closely checked and supervised by experienced personnel. *See* note 6 *supra*. There was no comparable check of the accuracy of MBG's cruiser. We therefore conclude that there was an adequate basis in the record for the greater weight placed by the trial judge on the reliability of HJW's cruise.

Plaintiffs also raise a possible technical inconsistency in the method used by HJW to calculate top utilization. In order to determine the volume of timber obtainable from a standing tree, it is necessary to estimate the point on the tree above which, on the average, the timber industry will not utilize the tree log content when the tree is felled. The top of a redwood tree is very knotty and limby and is generally not usable at the mill. In addition, when a large redwood tree is felled, breakage or shatter destroys the usability of some portion of the bole of the tree.[8] In order to remove judgmental errors with respect to top utiliza-

tion, HJW instructed its cruisers to measure each tree in numbers of 20-foot logs to a 12-inch diameter inside bark (DIB) top. From this data gathered in the field, HJW would later determine the point of top utilization based on statistics showing the timber industry's average top utilization. Volume above the average utilized top which was considered merchantable in the cruiser's opinion would be excluded to maintain the integrity and consistency of average industry practice.

Plaintiffs allege, based on the testimony of one of HJW's cruisers, that timber below the average utilized top which was considered unmerchantable by the cruiser was also excluded. Plaintiffs argue that average industry practices should be consistently applied and that therefore this unmerchantable timber below the average utilized top should be changed to merchantable. Testimony of MBG personnel suggested that some 4,454 MBF gross Spaulding scale should have been changed to merchantable in this manner. This same argument was made to the trial judge and was rejected by him but without any clear explanation therefor.

Plaintiff's have gone to great lengths to recalculate the alleged error in HJW's approach to top utilization without first firmly establishing that an error was made. The record indicates that with a very few possible exceptions, only "normal" trees were included in the sample obtained by HJW from various timber companies. HJW's top utilization averages were based on data for "trees without any substantial amount of visible mid or upper bole defects or deformities that usually contribute to a high loss from breakage when felled." It was therefore appropriate for HJW cruisers to report and exclude from volume unmerchantable timber caused by unusual and

---

7. MBG's gross volume determination was 192,-513 MBF Scribner scale. HJW's gross volume determination was 191,508 MBF Spaulding scale. While the parties used different volume tables and different top utilization procedures, neither of these efforts, on this record, can be said, with any degree of certainty, to have con-

tributed to the net volume difference between the parties.

8. MBG's method of estimating top utilization appears to be designed solely to account for the estimated point at which the tree will break when felled.

visible top defects. The testimony relied upon by plaintiffs does not establish that unmerchantable timber was excluded by cruisers because of the type of defects found in "normal" trees, which should have been accounted for solely by the application of industrywide averages.

### (2) Net Merchantable Volume

In calculating net merchantable volume, the trial judge began at that point in the HJW volume calculations where the gross Spaulding volume of merchantable logs is 159,758 MBF. To account for the internal defect in old-growth redwood timber, HJW utilized the standard Humboldt log rule, i. e., a 30-percent reduction in the gross Spaulding timber volume figure. This exercise produced a volume figure of 111,831 MBF Humboldt scale (159,758 × 0.70). HJW then calculated a 3-percent deduction for breakage, which occurs when redwood trees are felled, to arrive at a volume figure of 108,476 MBF Humboldt scale (111,831 × 0.97). Dead and down timber (4,455 MBF) was added to this result to produce HJW's old-growth redwood timber volume of 112,931 MBF Humboldt scale.

The trial judge found that the standard Humboldt log rule was not an appropriate scale to use in this case. Although the Humboldt log rule was the standard scale utilized in the redwood region in 1968, the record indicated that in situations where data, empirical studies, or experience showed that the internal defects in old-growth redwood stands were less than 30 percent, buyers and sellers of old-growth redwood would utilize such information in negotiating timber sales.[9] HJW used the Humboldt log rule in its volume computations because it was required by the contract it had with defendant (Bureau of Outdoor Recreation (BOR), Department of the Interior) relative to appraisal of plaintiffs' taken lands. The trial judge noted that the testimony of Wallen and Kevin strongly suggested that but for the BOR contract requirement to report volume using the standard Humboldt log rule, HJW would have reported timber volume in this case on a net Spaulding log rule or scale. Moreover, both Wallen and Kevin conceded that the percent of internal defect in plaintiffs' taken timber was undoubtedly less than 30 percent. Kevin testified that, in his opinion, the percent of internal defects in plaintiffs' taken old-growth redwood timber was probably in the neighborhood of 26 to 28 percent.

There was in evidence the results of a study of actual logging operations on plaintiffs' timberlands, conducted during the period 1964–66, in an area that was subsequently included in Redwood National Park. The logging results during this period were scaled in both Scribner and Humboldt log rules. While the specific purpose of this study was not directed solely at establishing internal defect percentages, the computed data was such that a reasonable conclusion relative thereto could be drawn therefrom. This study data indicated, according to Alexander, roughly a 27-percent internal defect rate in the redwood timber logged on plaintiffs' timberlands during the 1964–66 period. The trial judge concluded that the timberlands involved in the 1964–66 logging operations were generally representative of plaintiffs' Del Norte County timberlands and that these study results would have been available to reasonable and knowledgeable buyers of plaintiffs' old-growth redwood timber. The trial judge therefore concluded that a reasonable estimate of the percentage of defect in the old-growth redwood trees taken from plaintiffs would be 27 percent.

Defendant has accepted the trial judge's finding on this point, but plaintiffs maintain that the defect rate found by the trial judge was too high. Specifically, plaintiffs dispute the trial judge's conclusion that the timberlands involved in the 1964–66 logging operations were generally representative of plaintiffs' Del Norte County timberlands.

---

**9.** If the empirical data indicated a defect factor of 30 percent, the volume determinations were automatically considered to reflect Humboldt log rule or scale. If the percent of defect was less than 30 percent, the volume determinations were generally viewed as one of the many variations of the Spaulding or Scribner log rules.

Alexander testified that only 40 percent of plaintiffs' taken timber was similar to that logged in 1964–66. Alexander estimated the defects in the taken timber to be 18.65 percent. This percentage was developed by applying the defect rate for each log grade to the mix of log grades in the taken timber as determined by the MBG cruise. The mix of log grades was estimated by MBG's cruiser, Whitehead, from his observations of the standing trees during his cruise. The defect rate for each log grade was derived from a 5-year study (1969–74) of the defect rate in plaintiffs' Del Norte County timberlands as shown by actual old-growth redwood logging operations. This study also showed an overall average defect rate of 25.35 percent.

Conceding the accuracy of the empirical data from the 1969–74 study applied by Alexander, the accuracy of Alexander's estimate of 18.65 percent still depended entirely on the estimate by Whitehead of the mix of log grades in plaintiffs' taken timber. Plaintiffs agree with the trial judge's finding that "[g]rading logs on standing trees, especially peeler grade logs, is deemed a most difficult undertaking, requiring great skill, experience and knowledge of redwood timber." Plaintiffs maintain that Whitehead had the skill and experience to do this task accurately. Plaintiffs object to the trial judge's further findings that "[e]ven with such skills, the presence of hidden, internal defects in large old-growth redwood is more often than not beyond human perception in the forest" and that "[s]ince large old-growth redwood has few external indicators of internal defect, one can reasonably wonder how it would be possible to estimate with any degree of reasonable certainty the percentage of internal defect present in a large standing old-growth redwood tree." Defendant's own expert, Wallen, indicated that approximately one-half of all cruises were performed based on the cruiser's estimate of defect and breakage and that he himself had cruised in this manner in the past.

While the trial judge may have overstated the difficulty of estimating the defect rate or log grade of standing old-growth redwood timber, his hesitation in deciding this issue based entirely on the expertise of one man is understandable. Wallen's testimony indicates that cruises are often done in the same manner as MBG's cruise, but his testimony certainly does not indicate that it is the best or most reliable method. Deference should properly be shown to the trial judge in assessing the credibility of the cruising method employed by Whitehead, who was a witness and explained his method to the trial judge at length. The trial judge found inconsistencies and judgmental errors in the cruise as explained by Whitehead and concluded that his estimate of the quality of the timber taken from plaintiffs was overly optimistic. It must also be remembered that the 18.65-percent defect rate developed by Alexander from Whitehead's estimate of log grades differed substantially from the rates shown by actual experience. An average defect rate of 25.35 percent was shown by the 1969–74 study of plaintiffs' logging operations, and the records of the 1964–66 cut, which was made on 209 acres of plaintiffs' land taken in 1968, indicated an average defect rate of approximately 27 percent. We therefore conclude that the trial judge acted within his proper discretion in not relying on Whitehead's estimate of the log grades in the taken timber, and we affirm his finding of a 27-percent defect rate in the old-growth redwood trees taken from plaintiffs.

### (3) Breakage

After finding that the proper rate for allowance of internal defects was 27 percent, the trial judge applied the 3-percent deduction for breakage used by HJW in its calculation of the Humboldt scale volume of plaintiffs' taken timber. The trial judge considered and rejected arguments by plaintiffs that according to general usage the 30-percent reduction required by the use of the Humboldt log rule already included a factor for breakage as well as internal defects. Because of the trial judge's reliance on the results of the 1964–66 cut in determining the internal defect rate of plaintiffs' taken timber, plaintiffs again argue that an additional reduction of

volume for breakage was improper, but their argument has a different basis.

Plaintiffs argue that the 27-percent rate accounts for all defects, including breakage found in the timber cut in 1964–66. Plaintiffs contend that 27 percent is the total difference between the gross and net Scribner scale volume of merchantable logs determined during the cut. The net Scribner volume seems clearly to apply to the net volume of the cut timber brought to the mill. The problem in resolving this issue is tied to the uncertainty as to exactly what was measured by the gross Scribner volume in the records of plaintiffs' 1964–66 cut. Ordinarily, broken pieces which are badly shattered when a tree is felled will not be delivered to the mill. The broken material will be left in the forest where it fell. Thus, if the gross Scribner volume as shown in plaintiffs' 1964–66 cut measures only the gross volume delivered to the mill, an additional percentage must be deducted to account for broken pieces left in the forest when calculating the net volume of standing trees. While the records of the 1964–66 cut before the court do not clearly indicate whether the gross Scribner volume figures reflect gross volume measured in the forest or as delivered to the mill, it seems unlikely that plaintiffs would go to the trouble of measuring the volume of broken pieces. Significantly, plaintiffs have made no showing that the gross Scribner volume of the 1964–66 cut represented any figure other than the volume delivered to the mill. Thus, the additional 3-percent reduction of volume to account for breakage was proper based on the record before the trial judge.

(4) *Chunks or Split Products*

The parties disagreed before the trial judge as to whether the timber volume to be ascribed to the taking of plaintiffs' land should include volume in timber remnants remaining on the ground after a tree has been felled and logged. The remnants in question contain some merchantable lumber and do have a value. Plaintiffs refer to these timber remnants as "chunks" while defendant refers to them as "split products." MGB included "chunks" in its timber volume determinations, whereas HJW did not.

Kevin and Wallen agreed that chunks or split products were utilized in the redwood industry as of October 2, 1968. HJW felt that such materials would have been left behind on the forest floor after logging operations were concluded and thus would be included in the value assigned to the land and would not be included in the value assigned to the standing timber. The trial judge was not persuaded that the HJW estimate of fair market value of plaintiffs' taken land included a factor for the value of merchantable volume of split products.[10]

The trial judge therefore increased the HJW volume determination by the amount of merchantable volume in the *standing* redwood trees which would be attributable to chunks or split products. The trial judge accepted an estimate by Kevin as to the volume of projected chunks to be left if the standing trees were cut. Kevin estimated that split products, relative to plaintiffs' taken timber would constitute about 1,100 MBF net Spaulding scale of merchantable timber out of the 15,431 MBF of gross Spaulding scale which the HJW cruise designated as cull volume and thus was not included as merchantable timber volume in the HJW net timber volume determination. Kevin's estimate was based on Wallen's determination, supported by his long redwood experience, that 20 percent of redwood cull volume in logs which were 60 inches diameter inside bark (DIB) and larger would provide suitable merchantable timber volume. Kevin applied this 20-percent determination to the cruise data reflecting trees with logs of 60-inch DIB or larger to arrive at his split products estimate of 1,100 MBF.

Defendant now agrees with the finding of the trial judge that volume should be

---

10. There was evidence in the record that two of the comparable sales (Simpson Timber Company to IMBC) relied on by Kevin as indicators of timber value included chunks in the timber volume cruise data underscoring the sales. Including chunks or split products in the HJW volume determinations made those sales more comparable as indicators of timber value.

increased by the amount attributable to chunks, but plaintiffs except and maintain that the volume of chunks found by the trial judge was too low. Plaintiffs argue that MBG's estimate of volume attributable to chunks, 4,146 MBF, should have been accepted by the trial judge because MBG's cruise included the volume of chunks which would be recovered from plaintiffs' taken lands after a cutting whereas HJW's cruise did not. Plaintiffs have not effectively rebutted the trial judge's conclusion that, because of the manner in which MBG cruised plaintiffs' lands, the volume attributable to chunks in MBG's cruise could not be adequately segregated from its estimate of total merchantable volume. Therefore, plaintiffs' figure of 4,146 MBF cannot be considered reliable. In addition, plaintiffs' argument that HJW's volume determination did not include the volume attributable to chunks is not wholly accurate. While HJW's final determination of merchantable volume did not include volume attributable to chunks, this figure was included in HJW's estimate of cull volume. The trial judge approved the approach by which Kevin segregated the volume attributable to chunks and split products out of total cull volume and then added it back into merchantable volume. We believe that this choice by the trial judge between two estimates, neither of which was wholly satisfactory, was reasonable and should not be disturbed.

### (5) *Summary*

Resolution of the volume issue in this case has been a very difficult task. The record on the volume matter was conflicting. The different approaches taken by the parties and the use of different log rules or scales served to compound the difficulty. It was conceded by all the experts and timber operators who testified in this case that the percent of internal defect in the standing old-growth redwood timber taken from plaintiffs would be less than the 30 percent required by application of the standard Humboldt log rule or scale. As indicated previously, a reasonable estimate of the percent of defect in said timber would be 27 percent. Substituting 0.73 for the 0.70 fig-

ure in the HJW volume computation set forth above, with other computation figures remaining the same, including the 3-percent reduction for breakage, produces a net volume figure of 117,578 MBF. This figure, however, can no longer be considered to reflect Humboldt log rule or scale. Since it attempts to reflect the actual internal defect in the redwood timber, it more properly should be described as reflecting a net Spaulding or net Scribner log rule or scale. To this 117,578 MBF figure must be added the volume of 1,100 MBF representing chunks or split products, heretofore determined to have been improperly excluded from the HJW volume determination.

On the basis of the totality of the record, it is found that a reasonable estimate of the volume of old-growth redwood timber taken from the individual plaintiffs on October 2, 1968, is 118,678 MBF net Spaulding or net Scribner scale (117,578 MBF plus 1,100 MBF).

### B. *Value of Old-Growth Redwood Timber.*

It is conceded that plaintiffs are to be paid just compensation for the value of the old-growth redwood timber taken by defendant. Fair market value is a concept that has been associated with just compensation determinations but that term is not considered to be an absolute standard nor an exclusive method of valuation. In *United States v. Fuller*, 409 U.S. 488, 490, 93 S.Ct. 801, 803, 35 L.Ed.2d 16 (1973), the Supreme Court observed that "[t]he constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness * * * as it does from technical concepts of property law." As a result, courts have had to adopt working rules in order to do substantial justice in just compensation cases. *United States v. Miller*, 317 U.S. 369, 375, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943). Courts are favorably inclined toward market value as a fair indicia of just compensation, but the concept of just compensation cannot be reduced to a formula, *United States v. Cors*, 337 U.S. 325, 332, 69 S.Ct. 1086, 1090, 93 L.Ed. 1392 (1949), nor can it be reduced to

inexorable rules, *United States v. Toronto, Hamilton & Buffalo Navigation Co.,* 338 U.S. 396, 402, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949). Under the circumstances of this case, determination of the fair market value of plaintiffs' taken timber is an appropriate and practical approach to a just compensation conclusion, keeping in mind the observations noted above.

Fair market value has been defined in various ways. In *Jack Daniel Distillery v. United States,* 180 Ct.Cl. 308, 315–16, 379 F.2d 569, 574 (1967), the court stated, "The legal definition of fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts." *See also Almota Farmers Elevator & Whse. Co. v. United States,* 409 U.S. 470, 473, 93 S.Ct. 791, 794, 35 L.Ed.2d 1 (1973). As is obvious from decisions in valuation cases, the term "value" is not a single purpose word. *Andrews v. Commissioner,* 135 F.2d 314, 317 (2d Cir. 1943), *cert. denied,* 320 U.S. 748, 64 S.Ct. 51, 88 L.Ed. 444 (1943); *see also* 1 Orgel, Valuation Under Law of Eminent Domain § 20, at 93 (2d ed.).

In this case, the parties utilized two very different methods of calculating the fair market value of the old-growth redwood timber taken from the individual plaintiffs.

Alexander utilized a conversion return analysis in arriving at his opinion. Alexander determined this value to be $14,576,928. Using MBG's net Scribner scale volume determination of 138,223 MBF, the above value figure works out arithmetically to around $105.46 per MBF. Using MBG's Humboldt-by-conversion figure of 119,445 MBF, this works out arithmetically to $122.04 per MBF. The conversion return method of arriving at a market value figure for timber, properly formulated, is an acceptable valuation technique. *See United States v. Cornish,* 348 F.2d 175, 182–83 (9th Cir. 1965).

In simple terms, a conversion return appraisal of timber, as utilized by Alexander, starts with the gross income to be derived from selling the lumber which would be manufactured from the timber to be evaluated. From this gross income figure, the related costs involved, *i. e.,* logging and manufacturing, would be subtracted to obtain what is described as a conversion return figure. This conversion return figure is then allocated between profit and stumpage. Stumpage is the standing timber to be evaluated. *See United States v. Cornish, supra,* 348 F.2d at 183.

A considerable amount of detailed information is required for the conversion return method of appraisal. Alexander relied on data in the Miller Redwood Company's annual report for the year ending February 28, 1969, for lumber sale prices and manufacturing costs. He relied on the Rellim Redwood Company's annual report covering the same period for logging and related costs. Alexander made adjustments in his use of his data to reflect his opinion as to the superior quality of the taken timber and his view that a prospective buyer would utilize the timber for peeler log purposes (as veneer) to the largest extent possible rather than for sawlog purposes since peeler logs produced greater revenue than sawlogs.

The trial judge rejected Alexander's conversion return appraisal as an appropriate indicator of the fair market value of plaintiffs' taken timber and stressed two reasons for his rejection. First, the trial judge noted that the exclusive use of cost data derived from the Miller family complex (rather than average industry costs) could make the appraisal reflect only the special value to the owner of the property rather than fair market value. The special value of taken property to an owner is not compensable. *United States v. 564.54 Acres of Land,* 441 U.S. 506, 511, 99 S.Ct. 1854, 1857, 60 L.Ed.2d 435 (1979); *United States v. Cors, supra,* 337 U.S. at 332, 69 S.Ct. at 1090; *United States v. Cornish, supra,* 348 F.2d at 182–83. Second, the trial judge questioned Alexander's allocation of the remaining value (after deduction for costs) 15 percent to sawmill profit and 85 percent to stumpage value. In the trial judge's opinion, the sales used by Alexander for the

basis of the allocation showed no comparability with the taken timber, and Alexander did not give sufficient attention in making his appraisal to the actual transfer prices of timber between the individual plaintiffs and Rellim or to the actual 27-percent profit derived by Miller Redwood on its sawmill operation.

The trial judge gave greater weight to the comparable sales approach used by Kevin as an indicator of value. Kevin relied on four sales as providing reasonable indicators of redwood timber value on October 2, 1968. Kevin, in his investigation of sales data, discovered there were only a few old-growth redwood timber sales close to the taking date set forth above. Moreover, there were no timber sales in terms of timber volume truly comparable with the volume of timber on the taken lands. There were other variations between the comparable sales timber and the taken timber. Because there were these other variations, adjustments to the base prices of the indicator sales were made by Kevin in order to equate, to the extent possible, factors such as time of sale in relation to the taking date, quality of timber, method of scale, and logging and haul costs.[11]

The mathematical average price of the four sales utilized by Kevin as indicators of value was $89.25 per MBF Humboldt scale. Kevin offered $90 per MBF as his opinion of the value of the old-growth redwood timber taken from plaintiffs. The trial judge found that one of these four sales, involving the Pacific Lumber Company (seller) and the State of California (buyer), may have been tainted by the threat or specter of condemnation. For this reason, this sale was given no weight. The mathematical average price of Kevin's three remaining indicator sales was approximately $92 per MBF Humboldt scale, which the trial judge found to be a reasonable indicator of value.

Finally, the trial judge noted that Kevin's value figure was based on the old-growth redwood timber being scaled on the Humboldt log rule, while the net timber volume result reached by the trial judge (and adopted by the court) was scaled in net Scribner or Spaulding. Generally, use of the Humboldt scale in timber volume determinations produces a higher price per MBF than does use of the Scribner or Spaulding scale. Analysis of the Miller Redwood and Rellim annual reports indicates that the price differential relative to these log scales ranges from $1.164 per MBF to $1.962 per MBF. The record suggests that Kevin's opinion value price per MBF probably would be lower if he had scaled the taken timber in net Scribner or Spaulding. However, the trial judge concluded, under the unusual and complicated circumstances of this case, that no reduction in Kevin's opinion value per MBF figure would be appropriate because some consideration should be given to the redwood peeler aspects of the taken timber, a value aspect which was not considered by Kevin in his evaluation analysis.[12]

---

11. The practice of adjusting comparable sales data, especially by one as experienced in redwood matters as Kevin, in order to achieve greater comparability is considered an acceptable valuation technique under the circumstances of this case. Its acceptance herein manifests a practical and reasonable approach to valuation under difficult conditions. *See United States v. Cors, supra,* 337 U.S. at 332, 69 S.Ct. at 1090.

12. The trial judge believed that a knowledgeable and informed buyer and seller of old-growth redwood timber on October 2, 1968, would take some account of the peeler potential of the high quality redwood timber taken from plaintiffs. While it is true that as of the taking date there was no established or defined stumpage market for redwood peeler logs, as such, it is also true that some redwood peeler logs were sold in California in 1968. The absence of a defined market can be explained by the fact that some timber companies who peeled redwood also owned redwood timberland and thus used their peeler quality logs in their own veneer manufacturing process instead of making these logs available for sale on the open market. There were sawmills, other than plaintiffs', that peeled redwood, and they would undoubtedly purchase redwood quality logs for peeling purposes if such timber were made available for sale on October 2, 1968. It would be unfair and unreasonable to exclude redwood peeler logs from some evaluation consideration in this case.

Plaintiffs object to the trial judge's rejection of Alexander's conversion return appraisal and argue that both grounds offered by the trial judge in support of his rejection of Alexander's appraisal were erroneous. Plaintiffs further contend that Alexander's appraisal was the only evidence before the trial judge on the value of peelers. In their view, Kevin's appraisal should not have been given much weight because of the absence of any significant quantity of peelers in the sales cited by Kevin as comparable.

First, plaintiffs argue that it was erroneous for the trial judge to consider the actual transfer price of the timber between the individual plaintiffs and Rellim. Rellim, which harvested the timber, and Miller Redwood, which manufactured the timber into lumber, veneer, or other wood products, were both wholly owned by Stimson, which was in turn controlled by the individual plaintiffs. The timber sales were not at arm's length, and the prices at which the family sold logs to Rellim were set by a formula established by a compromise agreement with the Internal Revenue Service in 1959. This formula was kept current by relating it constantly to the Wholesale Price Commodity Index. Plaintiffs argue that the prices set by the formula were too low and did not reflect the full value of the stumpage.[13]

■ The transfer price was clearly not negotiated in an arm's-length transaction, and plaintiffs therefore argue that it should have been given no weight. The transfer price fixed by an agreement with the Internal Revenue Service is also analogized by plaintiffs to assessed valuations for proper-

ty taxes. Such assessments are not admissible as evidence of fair market value in a condemnation proceeding as they merely represent the opinion of the tax assessor who was not called as a witness. *United States v. Certain Parcels of Land*, 261 F.2d 287, 290 (4th Cir. 1958). Evidence of the transfer price was properly admissible in this case. It was an operative fact as the actual price at which the timber changed hands and not merely someone's opinion of fair market value. Plaintiffs as well as the Internal Revenue Service were parties to the agreement by which the price was set. While the transfer price could not be given as much weight as an arm's-length transaction, the trial judge could properly consider it for what it was worth. *District of Columbia Redevelopment Land Agency v. 61 Parcels of Land*, 235 F.2d 864 (D.C.Cir. 1956).

Second, plaintiffs argue that Alexander's appraisal was conservative and did not reflect any special value to plaintiffs. The costs experienced by Rellim and Miller Redwood and utilized by Alexander in his appraisal were higher than average industry costs. The use of higher costs in a conversion return appraisal will produce a lower stumpage value. While there is some merit to plaintiffs' arguments, they fail to take into account the adjustments made by Alexander based on his assumptions that the taken timber was superior in quality to the timber harvested, manufactured, and sold by Rellim and Miller Redwood during the period from which Alexander drew his data. Superior timber has fewer defects and therefore costs less to manufacture. The

13. The transfer price also affected the profits earned by Miller Redwood which were compared by the trial judge to the profit allocated by Alexander in his conversion return appraisal. If, as plaintiffs allege, the transfer price was too low, this would lower the costs of Miller Redwood, thus increasing its profits. Plaintiffs argue that the IRS formula was designed to lower the amount received by the individual plaintiffs which was taxable as capital gains and to raise the profits of the corporations which were taxable as ordinary income. Furthermore, plaintiffs contend that the trial judge incorrectly compared the actual 27-per-

cent ratio of profits to gross sales or revenue to Alexander's 15-percent ratio of profits to conversion return (which equals gross revenue minus costs). While the trial judge may have so erred, analysis of plaintiffs' argument shows that a proper comparison would only increase the disparity between the actual profits earned by Miller Redwood and the profits allocated in Alexander's conversion return appraisal. When compared to 27 percent of gross revenue, 15 percent of gross revenue less costs is even less than 15 percent of gross revenue without reduction.

costs actually experienced were adjusted downwards by Alexander, and these costs as adjusted were found to be higher than the low average industry cost of manufacturing superior quality timber comparable to that assumed by Alexander. The trial judge has disagreed with Alexander's assumptions as to the superior quality of the taken timber, and this court has affirmed that portion of the trial judge's opinion. Because Alexander's basic assumptions in his conversion return analysis were in error, it would have been very difficult for the trial judge to remove these errors and to correct the end result of Alexander's analysis.

This court will not attempt to second-guess the trial judge in this very complex case. The approaches employed by both parties contained errors of differing degrees. The trial judge concluded that he could reach the best result by starting with Kevin's comparable sales analysis despite the absence of any consideration of peeler value. The trial judge made the best possible estimate of the extra value attributable to peelers that could be made on the evidence available. The award to plaintiffs was adjusted to reflect the trial judge's estimate. Evaluation generally is a matter of judgment and sometimes is no more than a "guess by informed persons." *United States v. Miller, supra,* 317 U.S. at 375, 63 S.Ct. at 280. If it were possible to correct all of the errors in Alexander's conversion return appraisal, that appraisal might indeed have provided the best and most exact evidence of peeler value. Plaintiffs have not convinced us that such a correction was feasible on the record before the trial judge.

■ We therefore affirm the findings of the trial judge as to the volume and price per MBF and his ultimate determination that the fair market value of the old-growth redwood timber taken from the individual plaintiffs is $10,918,376 (118,678 MBF × $92 per MBF).

## III

Plaintiffs, both individual and corporate, seek to recover severance damages, in the total amount of $588,713, as a result of the taking of a portion of the timberlands of the individual plaintiffs.

■ As observed in *United States v. Miller, supra,* 317 U.S. at 376, 63 S.Ct. at 281, "[i]f only a portion of a single tract is taken, the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire tract [footnote omitted]. Such damage is often, though somewhat loosely, spoken of as severance damage." *See* 4A Nichols, The Law of Eminent Domain § 14.1[3] (3d rev. ed. 1969). Severance damage, by its very nature, arises only on the taking of a portion of the owners' property and is directed at the diminution in value of the remaining portion not taken. The burden of proof is upon the plaintiffs to show entitlement to severance damages. *United States v. 72.35 Acres of Land,* 150 F.Supp. 271, 274 (E.D.N.Y.1957). Indeed, in situations similar to that faced by the corporate plaintiffs herein strict proof of loss in market value of the remainder property is obligatory. *United States v. Honolulu Plantation Co.,* 182 F.2d 172, 179 (9th Cir.), *cert. denied,* 340 U.S. 820, 71 S.Ct. 51, 95 L.Ed. 602 (1950).

It is to be noted that none of the lands or property of the corporate plaintiffs, Stimson and Miller Redwood, were taken. There is a dispute between the parties as to whether any land owned by the other corporate plaintiff, Rellim, was taken.[14] Defendant argues that the corporate plaintiffs have no standing to sue for severance damages since they did not possess legal title to the taken lands. This lack of unity of title, defendant maintains, precludes considera-

---

14. Plaintiffs insist that some portion of Rellim's right-of-way lands was taken. Defendant maintains that no lands of Rellim were taken, referring to *Miller v. United States,* 209 Ct.Cl. 135, 531 F.2d 510 (1976), wherein the court upheld the Secretary's authority to modify the boundaries of Redwood National Park so as to exclude certain lands from being taken. The record is such that we cannot resolve this dispute. However, resolution is not necessary to reach determinations on issues presented herein.

tion of the severance damage claims of the corporate plaintiffs. Since it is concluded, *infra*, that the corporate plaintiffs are not entitled to any severance damages, it is not necessary to reach this issue.

■ In their severance damage presentations, plaintiffs did not use a before-and-after appraisal value approach. Instead, plaintiffs sought to establish depreciation in value in specified and localized areas of the integrated enterprise operated by the plaintiffs which they allege was directly attributable to the taking. Defendant advised it would offer no technical objection to the absence of evidence of a before-and-after appraisal, citing *United States v. Wateree Power Co.*, 220 F.2d 226, 231–32 (4th Cir. 1955). As indicated earlier, the concept of just compensation cannot, and should not, be reduced to a set formula or inexorable rules. Under the circumstances, it cannot be said that plaintiffs' severance damage value approach should be rejected merely because it did not follow the generally recognized before-and-after approach. *See Aaron v. United States*, 167 Ct.Cl. 818, 825, 340 F.2d 655, 659 (1964).

Plaintiffs' severance damage claims may be categorized as follows: (1) standing cold deck (timber inventory); (2) depreciation of sawmill facilities; (3) roads; (4) incompatible neighbor; (5) water supply source; and (6) gravel bar deposits. Only categories (1) and (2) represent direct severance damage claims by a corporate plaintiff, *i. e.*, Miller Redwood. The remaining categories represent severance damage claims by the individual plaintiffs.

### (1) *Standing Cold Deck*

As of October 2, 1968, the plaintiffs viewed the taken old-growth redwood timber standing along Mill Creek, which was within reasonable distance of the Miller Redwood sawmill facilities, as a "standing cold deck," or an inventory of standing trees, which could readily provide a nearby available supply of logs for mill operations

in an emergency. Because of this nearby available timber supply, Miller Redwood maintained a log inventory for winter operations of some 2.5 million board feet. Generally, logging operations would be limited by winter weather. Accordingly, the log inventory figure, *supra*, was geared to getting the sawmill operations through the winter months. However, in an emergency (*i. e.*, exhaustion of the log inventory) these nearby trees could easily be logged and thus could supply logs for sawmill operations until logging operations in other areas opened up. As a result of the taking of the timber which constituted Miller Redwood's standing cold deck, Miller Redwood maintains it had to change its inventory practice by increasing its log inventory to some 4.5 million board feet in order to insure that mill facilities would remain operational throughout the winter. This change in log inventory practices is the basis for Miller Redwood's standing cold deck severance claim.[15]

The trial judge determined that his standing cold deck claim, as presented by plaintiffs, represented consequential damages and not direct damages flowing from the taking of the timber in issue. Plaintiffs argue that the trial judge erred in categorizing their claims as being noncompensable "consequential" damages. There was testimony that a prospective buyer would have paid less for plaintiffs' remaining land because of the loss of their standing cold deck. Plaintiffs distinguished between noncompensable damages for the frustration of business plans and compensable damages for the loss of value to the remaining property.

■ We agree that the law does draw the distinction urged by plaintiffs. *See R. J. Widen Co. v. United States*, 174 Ct.Cl. 1020, 1029 n. 10, 357 F.2d 988, 994 n. 10 (1966); *Baetjer v. United States*, 143 F.2d 391, 395–96 (1st Cir. 1944). "There are numerous business losses which result from

15. The essence of the claim, dollarwise, is that greater capital is tied up in larger log inventories. Further, maintaining larger log inventories would, according to Alexander, result in

increased personal property taxes. Alexander computed the severance damages on this claim to be $110,565.

condemnation of properties but which are not compensable under the Fifth Amendment." *United States ex rel. T. V. A. v. Powelson,* 319 U.S. 266, 281, 63 S.Ct. 1047, 1055, 87 L.Ed. 1390 (1943); *see also United States v. General Motors Corp.,* 323 U.S. 373, 379, 382, 65 S.Ct. 357, 360, 361, 89 L.Ed. 311 (1945); *Mitchell v. United States,* 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644 (1925). If, however, only a portion of a single tract is taken, the owner's compensation for that taking includes any element of value arising out of the relationship of the part taken to the entire tract. *United States v. Miller, supra,* 317 U.S. at 375–76, 63 S.Ct. at 280–81; *see also Campbell v. United States,* 266 U.S. 368, 371, 45 S.Ct. 115, 116, 69 L.Ed. 328 (1924); *United States v. Grizzard,* 219 U.S. 180, 31 S.Ct. 162, 55 L.Ed. 165 (1911). Assuming that sufficient unity of ownership existed, plaintiffs would be entitled to recover any diminution in the value of their remaining property.

Although the distinction drawn by plaintiffs is correct, a close reading of the trial judge's opinion indicates that he did not misapply the law. In addition to his conclusion that consequential business damages were not recoverable, the trial judge was not persuaded that a reasonable and knowledgeable buyer and seller would have agreed to a reduction in the value of the remainder property by some $110,565 on the strength of plaintiffs' standing cold deck claim. The purpose behind Miller Redwood's standing cold deck was to insure the availability of logs for mill operation in the event an emergency required that trees from the standing cold deck be cut. Ostensibly, this standing cold deck was to be cut only in emergency situations. There was no evidence in the record that any such emergency arose, either before or after October 2, 1968. The trial judge speculated that Miller Redwood's management decision to increase log inventories after October 2, 1968, may well have been required by increased production demands. The veneer

plant became operational in June 1968 and this may have required an increase in log inventories. Further, the record indicated that other stands of old-growth redwood on timberlands of the individual plaintiffs were reasonably available to the mill site and could serve as an emergency standing cold deck. There was evidence in the record that some of this close-to-the-mill timber was cut subsequent to 1970, but there was no evidence such cutting was due to any emergency.

■ Plaintiffs argue that no one supported the trial judge's speculation that the increase in inventory may have been required by Miller Redwood's increased production capabilities. The trial judge's speculation on this point was gratuitous and did not constitute the real basis for his holding, which was that plaintiffs failed to substantiate that the increase in inventory was due to the reasons which they alleged, *i. e.,* the loss of the standing cold deck. Plaintiffs contend that the increase in inventory was predictable based on the testimony of Alexander, plaintiffs' general manager, and an independent mill operator. The testimony of parties employed by plaintiffs could properly be weighed with some degree of skepticism by the trial judge. Although the testimony of an employee of a party cannot be be disregarded simply because of such employment, *Chesapeake & Ohio Ry. v. Martin,* 283 U.S. 209, 216–20, 51 S.Ct. 453, 456–457, 75 L.Ed. 983 (1931), the absence of any emergency use of timber as a standing cold deck, either before or after the taking, also casts doubt on the large loss claimed to be occasioned by the taking of plaintiffs' "standing cold deck." As for the testimony of the independent mill operator, he merely agreed that the price of a mill would be less if there were no stand of high quality timber nearby. Since plaintiffs have failed to rebut the trial judge's conclusion that nearby timber which was not taken could also be used as an emergency source of timber in the winter,[16] the opinion of the indepen-

---

**16.** Plaintiffs attack Kevin's testimony on the other nearby timber which could be used as a standing cold deck. Although his testimony on

this point was not comprehensive in that he did not specify whether the remaining timber was of comparable volume and quality to the timber

dent mill operator lacks any application to the facts as established by the record. Therefore, the trial judge's resolution of this close factual question should not be disturbed. He is presumed, under the rules, to be correct and has not been shown to be clearly erroneous.

### (2) *Depreciation of Manufacturing Facilities*

Plaintiffs contend that a purchaser of the Miller Redwood manufacturing facilities after the taking of the timber in question would have paid $399,648 less than would have been the case before the taking. The basis for this severance damage claim is the view that the taking removed old-growth timber which, if not taken, would have borne a portion of the depreciation the remaining timber was required to bear relative to Miller Redwood's manufacturing operations subsequent to October 2, 1968.

The trial judge found that this severance damage claim, like the severance damage claim for the loss of plaintiffs' standing cold deck previously discussed, reflected a claim for consequential, not direct, damages. It must be agreed that the manner in which the claim was presented and calculated by plaintiffs tends to support the trial judge's conclusion that plaintiffs' claim was essentially for noncompensable consequential damages. Plaintiffs have, however, alleged that the taking reduced the value of their remaining land even though the manner of calculating this reduction in value seems to rely more on business accounting methods than appraisal methods. Thus, as discussed above, if any such reduction in value occurred, it constitutes compensable severance damages.

The trial judge found that a reasonable and knowledgeable buyer and seller of the Miller Redwood manufacturing facilities on October 2, 1968, would not have agreed to a reduction in the value of the facilities for a depreciation loss. The trial judge gave great weight to Kevin's testimony that any depreciation loss most probably would not become manifest until the timber supply on the nontaken lands was exhausted. Kevin believed that any claim for loss of value because of taken timber depreciation would almost always occur in the last years of a mill's operation rather than ratably on an annual basis throughout the mill's operating life. Accordingly, approximately 15 years would elapse before such a depreciation loss materialized. This seemed to the trial judge a rather remote basis for allowance of severance damages since so many things could (and in fact did) happen in the interim to neutralize any such anticipated loss. Subsequent to the taking, replacement timber was obtained by plaintiffs from timberlands in the Northern Redwood Purchase Unit conveyed by defendant to plaintiffs as part payment for the taken lands. Moreover, replacement timber became available on the market subsequent to 1969, and in 1972 plaintiffs purchased a tract of land (Johns tract) immediately east of plaintiffs' Mill Creek tract which contained some 160 million board feet of redwood timber.

Plaintiffs argue that as a matter of both law and fact it was improper for the trial judge to consider the subsequent acquisitions of timber as mitigating the severance damage to plaintiffs' mill. Plaintiffs' argument is based primarily on state court decisions, the majority of which hold that the subsequent acquisition, or possibility of a subsequent acquisition, of other land to restore the usability of the remaining land after the taking does not reduce the amount of severance damages.[17] The only federal case on point, *Porrata v. United States*, 158 F.2d 788 (1st Cir. 1947), estab-

taken, his testimony was a sufficient basis for reliance by the trial judge in the absence of more comprehensive evidence to the contrary.

17. *St. Patrick's Church v. State*, 30 App.Div.2d 473, 294 N.Y.S.2d 275 (1968); *Gluckman v. State*, 37 App.Div.2d 870, 325 N.Y.S.2d 99 (1971); *Department of Highways v. Intermoun-*

*tain Terminal Co.*, 164 Colo. 354, 435 P.2d 391 (1968); *Jones v. Providence Redevelopment Agency*, 92 R.I. 285, 168 A.2d 156 (1961); *contra Board of Education v. Commonwealth*, 528 S.W.2d 657 (Ky.1975); *State v. Style-Crete, Inc.*, 20 Utah 2d 365, 438 P.2d 537 (1968).

lishes a different rule and holds that the future availability of other land should be considered as the hypothetical "willing buyer" of the condemnee's remaining land would consider such a factor. We believe that this is the better rule in this case.

■■■ In weighing the probable effect of future events on the value at the time of the taking, it was proper for the trial judge to consider events occurring up to the time of trial. *United States v. Brooklyn Union Gas Co.*, 168 F.2d 391, 397–98 (2d Cir. 1948). If there were some grounds in 1968 for expecting an event to occur later, evidence that the event actually occurred is useful to confirm the expectations that a willing buyer would probably have at the time of the taking. "Experience is then available to correct uncertain prophecy." *Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698, 53 S.Ct. 736, 739, 77 L.Ed. 1449 (1933); see also *United States v. Westinghouse Co.*, 339 U.S. 261, 267–68, 70 S.Ct. 644, 647–648, 94 L.Ed. 816 (1950). Public L. No. 90–545 permitted landowners to exchange their land inside the park boundaries for timberland in the federally owned Northern Redwood Purchase Unit. While there was no certainty that in 1968 plaintiffs would receive an allocation of land from the purchase unit, such an allocation was likely in view of congressional concern to avoid needless disruption of the redwood timber industry. The 1972 purchase of the Johns tract was not specifically predictable, but it would have been reasonable for a buyer in 1968 to consider the possibility that some suitable timberland would become available sometime in the next 15 years before plaintiffs' remaining timber supply was exhausted.[18] Thus, there were sufficient facts in the record to justify the trial judge's holding that, because of the probability of a subsequent acquisition of timberland to extend the useful life of the mill, a reasonable buyer and seller in 1968 would not reduce the value of the plaintiffs' mill by some $399,648.

### (3) *Roads*

As a result of the taking, plaintiffs lost portions of two roads, the Stringer Gap Road and the Elkhorn Spur Road, which they had constructed through their timberlands. Plaintiffs seek as severance damages the costs of replacing the access they lost because of these partial road takings. There is general agreement between the parties that the reasonable costs of road replacement for the Stringer Gap Road are $5,762.78 and for the Elkhorn Spur Road $13,937.22.

Some 500 feet of the Stringer Gap Road were taken. The taking severed plaintiffs' timberlands in the following fashion: the road entered the park from plaintiffs' lands on the south boundary line of the park, traveled through the park some 500 feet, and exited on the east boundary line of the park into plaintiffs' lands. Plaintiffs had another road, the Cougar Ridge Road, on their remainder land which also served the timberlands in the area served by the Stringer Gap Road. The Cougar Ridge Road was east of and roughly parallel to the Stringer Gap Road. Both roads ran from the timberland areas in question to the mill facilities. However, use of the Cougar Ridge Road increased the log haul distance from one-quarter to one-half of a mile. In essence, prior to the taking, the Stringer Gap Road provided, in given circumstances, a short-cut haul distance to the mill. The point is that plaintiffs still had road access into the timberlands in question after the taking albeit a slightly longer haul distance would generally be involved. As of the date of trial, plaintiffs had not constructed any road to replace the portion of the Stringer Gap Road taken from them. The trial judge concluded that such a road replacement is unnecessary.

The Elkhorn Spur Road portion taken from plaintiffs was north and slightly west

---

**18.** Plaintiffs also argue that their loss was not mitigated by the purchase of the Johns tract as plaintiffs would have purchased it even if no taking of their timberland had occurred in order to extend further the useful life of their mill. In making this argument, plaintiffs implicitly assume that their mill would last without major reconstruction or repair as long as they had timber available. This assumption is not warranted on the record before us.

of the mill facilities. As of the date of trial, the portion of road taken was not of too much concern relative to plaintiffs' timberland operations. Ostensibly this was so because much of the area served by the portion of the road taken had been logged as of the date of taking. The basis for the severance damage claim is that in the future the portion of the Elkhorn Spur Road taken would provide access, for management purposes, to certain areas which would and/or did contain young, second-growth timber. Subsequent to October 2, 1968, plaintiffs constructed an addition to the Elkhorn Spur Road for purposes of harvesting timber in an area south of the park. Kevin was of the view that severance damages would not be appropriate for the Elkhorn Spur Road in any event because the additional road that was built would have had to be constructed in any event to log timber in the affected area. Plaintiffs concede that this additional road would have been built regardless of the taking of a portion of the Elkhorn Spur Road, but argue that if no taking had occurred the additional road would have been a cheaper type of road than the one built.[19] The trial judge found that, as of the date of trial, plaintiffs have not been significantly affected by the taking of a portion of the Elkhorn Spur Road.

■ After making the above conclusions, the trial judge also discussed the annual revocable use permits granted by the Park Service to plaintiffs allowing them to use the taken portions of the Stringer Gap and the Elkhorn Spur Roads in the conduct of their timber operations. The trial judge bolstered his previous conclusions with the further determination that a reasonable buyer would not demand a reduction in the price of the remaining land because of the annual use permits. Plaintiffs object to the trial judge's consideration of such use permits and maintain that such use permits were not sufficient to mitigate the loss of the fee ownership of the sections of the roads taken, because of uncertainty whether they will be renewed each year. We need not reach this issue. Plaintiffs have failed to rebut the trial judge's conclusions that regardless of the granting of the use permits plaintiffs were not significantly affected by the taking. At most, plaintiffs' access to certain portions of their timberlands has become slightly more circuitous. This does not constitute compensable severance damages. *Cheek v. Floyd County*, 308 F.Supp. 777, 781 (N.D.Ga.1970); *Priestly v. State*, 23 N.Y.2d 152, 295 N.Y.S.2d 659, 242 N.E.2d 827 (1968); *see* 4A Nichols, The Law of Eminent Domain § 14.2431 (3d rev. ed. 1969); *cf. Johnson v. United States*, 202 Ct.Cl. 405, 479 F.2d 1383 (1973); *United States v. Certain Land*, 439 F.2d 670 (3d Cir. 1971).

### (4) *Incompatible Neighbor*

As a result of the taking of the timberlands of the individual plaintiffs, a national park became their neighbor along a portion of the boundary of their remainder land. Plaintiffs view the park as an incompatible neighbor and seek to recover severance damages as a result thereof. Plaintiffs advance the following three categories of severance damages which they allege flow from the imposition on them of an incompatible neighbor: (a) game control; (b) property line identification; and (c) buffer strip.[20]

19. The cost of this additional road was $14,229.50. As indicated previously, the parties are in general agreement that replacement costs applicable to the portion of the Elkhorn Spur Road that was taken would be around $13,937.22. Whether the latter cost figure was somehow extracted from the actual road construction cost figure, *supra*, or reflected a pure cost estimate, is not clearly shown in this record.

20. Alexander estimated the incompatible neighbor severance damages to be $51,500. It would appear Alexander was of the opinion that items (a) and (b) would result in a decrease in land value to the remainder land of $19,632. Alexander also estimated that a forester's time at $2,000 per year, which he capitalized, would produce a severance damage value of $32,000 as of the date of taking. The claim was rounded off to $51,500. Alexander's estimate was not very persuasive. It was most subjective and was not related to any definitive evidence in the record.

■ Prior to the taking, plaintiffs' timberlands bordered on 4½ miles of the Jedediah Smith Redwood State Park, and on 9 miles of the Del Norte Coast Redwood State Park. Establishment of Redwood National Park resulted in a common boundary line between the park and plaintiffs' remainder lands of 7.6 miles. In short, before the taking, plaintiffs shared a common boundary with redwood parks of 13.25 miles, whereas after the taking their common boundary with redwood parks was increased to 20.85 miles. Plaintiffs argue that the primary use of their lands was for timber management and production, a use they believe incompatible with a redwood park which serves the public by providing for recreation and timber preservation. While there may be cases where the use to which the taken land is put is such as to cause depreciation to the remainder land and thereby justify severance damages relative thereto, see *United States v. Grizzard*, 219 U.S. 180, 31 S.Ct. 162, 55 L.Ed. 165 (1911); *West Virginia Pulp & Paper Co. v. United States*, 200 F.2d 100 (4th Cir. 1952); *but see United States v. Buhler*, 305 F.2d 319, 329 (5th Cir. 1962), this record will not support a conclusion that this is one of those cases. *See First National Bank of Brunswick v. United States*, 350 F.2d 606 (5th Cir. 1965). The existence of a park, local, state or national, is not inherently incompatible with, nor does it per se create a depreciating effect on, adjacent commercial timberlands. Indeed, the presence of a park is sometimes viewed as conferring a special benefit on neighboring owners. *See Reichelderfer v. Quinn*, 287 U.S. 315, 318–19, 53 S.Ct. 177, 178, 77 L.Ed. 331 (1932).

#### (a) *Game Control*

Plaintiffs maintain that creation of the park on October 2, 1968, created a protected haven for deer. It is known that deer sometimes feed on young-growth trees and other materials on cutover lands. Such feeding on young-growth redwood trees would impede and/or prevent the development of said trees. Plaintiffs suggest that after the taking, deer would undoubtedly feed on the young-growth trees growing on their remaining cutover lands and thereafter return to the safety of the park. Alexander testified as to his experience with deer damage to small trees, but that experience was not in the redwood region.

■ There is little evidence in the record as to deer activity on plaintiffs' timberlands either before or after the taking. There is no evidence in the record that deer damage or the deer population increased as a result of the taking. There is no evidence that deer, after the date of taking, made the National Park area their home for bedding and safety rather than other areas, including the areas of the state parks, which bordered plaintiffs' timberlands prior to the taking.[21] To the extent that the deer operated from parklands taken from others or from state park areas, plaintiffs would clearly have no right to recover. *Campbell v. United States*, 266 U.S. 368, 371–72, 45 S.Ct. 115, 116, 69 L.Ed. 328 (1924). Even if it be assumed that the use made of the land by defendant increased its attractiveness to deer, this fact would not justify any severance damage recovery in this case. *United States v. Pope & Talbot, Inc.*, 293 F.2d 822, 826 (9th Cir. 1961). There is no reasonable factual predicate which would support recovery on this claim. In any event, to the extent that deer damage to plaintiffs' young-growth trees occurred as a result of the taking, it was an unintended incident of the taking and thus insufficient to support a severance damage recovery. *See B Amusement Co. v. United States*, 148 Ct.Cl. 337, 341, 180 F.Supp. 386, 389 (1960). Finally, it is not believed that a reasonable buyer and seller of the remainder land would reduce the value of said land on the basis of

---

**21.** Plaintiffs ostensibly believe that the creation of the park would attract deer and that the deer would thereafter attack their young-growth trees on forays from the park's sanctuary. It is questionable if such intrusions, in any event, provide a basis for recovery of severance damages. *See United States v. Pope & Talbot, Inc.*, 293 F.2d 822, 826 (9th Cir. 1961); *Bishop v. United States*, 130 Ct.Cl. 198, 201, 203–04, 126 F.Supp. 449, 451–52 (1954), *cert. denied*, 349 U.S. 955, 75 S.Ct. 884, 99 L.Ed. 1279 (1955).

future deer damage to young-growth trees in the cutover areas.

### (b) Property Line Identification

Plaintiffs contend that because the park was its neighbor after the taking it expected to incur survey and resurvey costs each time there was activity by plaintiffs along the common boundary with the park. Plaintiffs suggest that cooperative agreements with park officials in this regard would not be possible because of the incompatible uses each makes of their lands. Alexander believed that any potential purchaser of the remainder land bordering the park would anticipate survey line problems relative to logging and other activities. The record will not support such assumptions and views.

■ After the taking, the boundary line in question was surveyed and flagged. There would be no need to resurvey. Further, there is no evidence in the record of any lack of cooperation from the Park Service nor is there any evidence that one could reasonably anticipate on October 2, 1968, that there would be no cooperation from the Park Service on boundary matters. Subsequent to the taking, plaintiffs conducted logging operations right up to the boundary line and there is no indication that they met with a lack of cooperation from park officials or that they had to resurvey the boundary line. This record will not support a severance damage claim based on property line identification merely because the new adjoining neighbor was a federal park. The fact that plaintiffs conducted logging operations on boundary lines it had with state redwood parks without property line identification problems, at least none are reflected in this record, prior to October 2, 1968, supports this conclusion.

### (c) Buffer Strip

Plaintiffs contend that after the taking, one could anticipate the issuance of a Government requirement controlling logging activities within an 800-foot buffer strip on plaintiffs' remainder lands adjoining the park. The purpose of this strip, which Alexander estimated would encompass some 737 acres, would be to prevent any encroachment on the physical and scenic aspects of the park. Since these controlled operations would be more costly than the usual operations plaintiffs would conduct if they were free to do so, plaintiffs believe severance damages are appropriate. The record does not justify the award of severance damages on this claim.

■ There is no evidence of any effort by the Park Service to control plaintiffs' logging operations on its remainder lands. There is no evidence that the Park Service directly or indirectly indicated to plaintiffs that logging operations in an 800-foot buffer strip or elsewhere on the remainder land should be conducted in any manner whatsoever. The manner of logging the area next to the boundary line remained Rellim's concern. It is true that logging operations in the vicinity of the park boundary line were discussed by the parties. However, this merely manifested the cooperative attitudes of both neighboring landowners. After the taking, Rellim moved in and cut timber on the remainder land right up to the park boundary line. There is no persuasive evidence that in these efforts plaintiffs utilized different operations or incurred additional costs merely because of the presence of the park. Kevin was of the opinion that increased logging costs would not be incurred because of the presence of the park. Kevin noted that buffer strips were not required along state park boundary lines when Rellim logged in those areas in 1964–66. Plaintiffs have failed to persuade, in their proposed findings or briefs, that they should recover severance damages because of an anticipated buffer strip. They have not shown there was a reasonable probability on October 2, 1968, or for a reasonable period of time thereafter, that the Park Service would, or even intended, to establish a buffer zone such as to interfere with plaintiffs' timber operations on its remainder land. See Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934).

### (5) *Water Supply Source*

The taken timberlands included the source of a domestic water supply. This source supplied water to a demonstration facility which plaintiffs constructed prior to the taking on remainder land. This demonstration facility was constructed in cooperation with the Redwood Region Conservation Council in order to demonstrate, educate, and familiarize the public with the activities of the redwood timber industry. This facility was available, at no charge, to community groups and the public. The water was piped from the source on the taken lands to the facility on the remainder land. This water source also supplied water to several dwellings located on the taken lands but occupied by tenants of the United States under rental agreements. After the taking, the Park Service granted annual revocable permits to plaintiffs so as to allow them to continue to utilize this water source for purposes of supplying water to the demonstration facility. As of the date of trial, some 9 years later, plaintiffs have had continued use of this water supply in the same manner as existed before the taking.

The trial judge initially found (apparently because of plaintiffs' failure to show otherwise) that to the extent that plaintiffs' water supply had a special value, it undoubtedly was duly considered in the amount paid plaintiffs. The parties are in general agreement that a reasonable cost estimate for replacing the taken water source as of the date of taking would be $2,300. Plaintiffs have not shown that this replacement cost exceeded any compensation already received as payment for the taking of the water supply. Therefore, this severance damage claim must be assumed to involve a double recovery for the loss already allowed as part of the payment for the land.

The trial judge also considered the effect that the issuance of any annual revo-

cable use permits had on this severance damage claim. Plaintiffs make the same objection to such consideration that they have made with respect to the severance damage claim for the taken roads. Since plaintiffs have failed to sustain their claim without regard to the issuance of such permits, we do not reach this question.

### (6) *Gravel Supply*

The lands taken from plaintiffs included some gravel bar deposit sources along and in the Mill Creek River. Plaintiffs used gravel bar deposits in the construction and/or maintenance of roads throughout their timberlands. Plaintiffs were not in the business of selling gravel bar deposits to others. Plaintiffs contend that a potential purchaser of the remainder lands would pay $5,000 less for said lands because of the taking of these gravel bar deposit sources.[22]

It has been said that an owner "is entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public." *Bauman v. Ross,* 167 U.S. 548, 574, 17 S.Ct. 966, 976, 42 L.Ed. 270 (1897). It is conceded that plaintiffs have been paid for the gravel bar deposits taken from them. Under the circumstances of this case, plaintiffs are not entitled to recover anything more for the taking of their gravel deposits.

There were other gravel bar deposit sources on plaintiffs' remainder lands available to them after the taking, although plaintiffs claim such available sources were smaller deposit areas and contained larger rocks. Plaintiffs further stress that the best gravel bar deposits were taken from them. If this is so, such added value presumably was considered in placing a value on the taken gravel. *See Mitchell v. United States, supra,* 267 U.S. at 345, 45 S.Ct. at 294. In addition to gravel bar deposit sources, plaintiffs' remainder lands contained other rock sources called bank rock

---

**22.** This estimate was predicated on extra costs which would be incurred in moving equipment to and from other gravel bar deposit sources, on the remainder land, over a period of some

20 to 25 years. It was estimated that 200 trips, at a cost of $250 per trip, would be involved (200 × $250 = $5,000).

sources, which could be used for road work purposes. In view of these other available rock sources on their remainder lands, it is doubtful that plaintiffs, in fact, incurred any appreciable severance damage because of the taking of some of their gravel bar deposit sources. In any event, plaintiffs' severance damage claim, based on the taking of gravel bar deposit sources for which they received payment, is in essence a claim for consequential damages for which there can be no recovery. *See Mitchell v. United States, supra,* 267 U.S. at 345–46, 45 S.Ct. at 294.

### IV

Public Law No. 90–545, § 3(b)(2), 16 U.S.C. § 79c(b)(2), under which plaintiffs' lands were taken, provides that just compensation will be paid plaintiffs for property taken from them by the United States, "including interest at the rate of 6 percentum per annum from the date of taking the property to the date of payment therefor * * *." Defendant maintains that payment of interest on any award rendered herein at the rate of 6 percent satisfies the just compensation requirement of the fifth amendment to the United States Constitution. Plaintiffs, on the other hand, argue in favor of an interest rate in excess of 6 percent.

 "Just compensation" in the constitutional sense has been held to include interest for delay in payment from the date of taking to the date of payment. *Albrecht v. United States,* 329 U.S. 599, 602, 67 S.Ct. 606, 608, 91 L.Ed. 532 (1947); *Seaboard Air Line Ry. v. United States,* 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664 (1923). Where there has been an appropriation of private property for public use within the meaning of the fifth amendment, "the right to interest or a fair equivalent, attaches itself automatically to the right to an award of damages." *Shoshone Tribe v. United States,* 299 U.S. 476, 497, 57 S.Ct. 244, 251, 81 L.Ed. 360 (1937). The determination of just compensation, including the proper rate of interest, is basically a question of fact. *United States v. 100 Acres of Land,* 468 F.2d

1261 (9th Cir. 1972), *cert. denied,* 414 U.S. 822, 864, 94 S.Ct. 119, 37, 38 L.Ed.2d 54, 84, (1973). As such, the determination of just compensation under the fifth amendment is exclusively a judicial function. *United States v. New River Collieries Co.,* 262 U.S. 341, 343–44, 43 S.Ct. 565, 566–67, 67 L.Ed. 1014 (1923); *Monongahela Nav. Co. v. United States,* 148 U.S. 312, 327, 13 S.Ct. 622, 626, 37 L.Ed. 463 (1893). It does not rest with Congress to say what compensation shall be paid, or even what shall be the rule of compensation. *Monongahela Nav. Co. v. United States, supra.* However, the rate of interest set by a statute can be applied to a claim for just compensation if such rate is reasonable and judicially acceptable. *County of Nassau v. Eveandra Enterprises, Inc.,* 42 N.Y.2d 849, 397 N.Y.S. 627, 366 N.E.2d 287 (1977), *appeal dismissed for want of substantial federal question,* 434 U.S. 804, 98 S.Ct. 34, 54 L.Ed.2d 62 (1977).

The trial judge concluded that the 6-percent rate of interest set forth in Pub.L. No. 90–545 was not binding on him but that a 6-percent rate was fair and judicially acceptable. We agree with the trial judge's conclusion that the 6-percent rate is not binding on the court and construe Pub.L. No. 90–545 as setting 6 percent as the minimum rate of interest payable rather than as setting a mandatory rate of interest to be applied in all cases. The phrasing of Pub.L. No. 90–545 with regard to the payment of interest is similar to the Declaration of Taking Act, 40 U.S.C. § 258a (1976), which was held in *United States v. Blankinship,* 543 F.2d 1272, 1276 (9th Cir. 1976), to set a floor on the rate of interest payable rather than a ceiling. Our holding is also based on the principle stated in *Phelps v. United States,* 274 U.S. 341, 344, 47 S.Ct. 611, 612, 71 L.Ed. 1083 (1927), that acts of Congress are to be construed and applied in harmony with and not to thwart the purpose of the Constitution. *See also Anniston Mfg. Co. v. Davis,* 301 U.S. 337, 351–52, 57 S.Ct. 816, 822, 823, 81 L.Ed. 1143 (1937). If 6 percent were viewed as a ceiling on the rate of interest, we would be compelled to conclude that Pub.L. No. 90–545 was constitutionally in-

firm because a 6-percent rate of interest is neither reasonable nor judicially acceptable under the circumstances of plaintiffs' case.[23] We therefore apply the settled principle that, whenever possible, a statute should be construed so as to avoid serious constitutional doubts. *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 369, 91 S.Ct. 1400, 1404–1405, 28 L.Ed.2d 822 (1971); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30, 57 S.Ct. 615, 620, 81 L.Ed. 893 (1937).

 We believe that the trial judge erred in holding a 6-percent rate of interest to be reasonable because of his improper reliance on the economic circumstances prevailing at the time of the taking. At that time, October 2, 1968, 6 percent was in excess of the rate of interest paid by the United States Treasury on all governmental obligations regardless of term, but the record shows that a rise in interest rates occurred after 1968. Plaintiffs would not receive just compensation if they were limited to the rate of interest prevailing in 1968. Examination of the significant cases setting interest rates, *Tektronix, Inc. v. United States*, 213 Ct.Cl. 257, 273–75, 552 F.2d 343, 352–53 (1977), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978); *Pitcairn v. United States*, 212 Ct.Cl. 168, 189–97, 547 F.2d 1106, 1120–24 (1976), *cert. denied*, 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978); *King v. United States*, 205 Ct.Cl. 512, 519–20, 504 F.2d 1138, 1142–43 (1974); *Confederated Salish & Kootenai Tribes v. United States*, 193 Ct.Cl. 801, 825–26, 437 F.2d 458, 472 (1971); and *United States v. Blankinship, supra*, 543 F.2d at 1275 n.1, shows that the courts have looked to the interest rates prevailing in the years between the date of taking and the date of payment. It was expressly stated in *Tektronix, Inc. v. United States, supra*, 213 Ct.Cl. at 276, 552 F.2d at 353 (concurring opinion), that "the rate of interest allowed as part of just compensation is to be derived from the economic circumstances of the times intervening the taking and payment dates * * *."

Defendant suggests that the present case is distinguishable from the above cases which either involved no statutory rate of interest or one set many years prior to the taking. In contrast, the rate of interest here was established by Pub.L. No. 90–545 contemporaneously with the taking. It would be possible for the courts to fix the interest rates received by any condemnee in the same manner as defendant suggests, *i. e.*, by reference to the prevailing rate of interest at the time of the taking. As indicated above, this approach has not been adopted by the courts. A superficial reading of Pub.L. No. 90–545 might indicate that Congress intended to establish a different treatment for redwood park landowners. There is, however, a strong judicial policy in favor of the establishment of a uniform rate of interest applicable to condemnation cases in order to avoid discrimination among litigants. *Arkansas Valley Ry. v. United States*, 107 Ct.Cl. 240, 259, 68 F.Supp. 727, 730 (1946), *cert. dismissed*, 330 U.S. 811, 67 S.Ct. 1083, 91 L.Ed. 1266 (1947); *accord,* . *Carlstrom v. United States*, 147 Ct.Cl. 297, 306, 177 F.Supp. 245, 250 (1959). The goal of uniformity would not be served by distinguishing between redwood park condemnees and other condemnees.[24] The

---

**23.** Our construction that Congress did not intend to establish 6 percent as the maximum rate of interest is reinforced by other language in the statute which must be construed in a similar manner. Public L. No. 90–545 provides for the payment of just compensation "subject to the appropriation limitation in section 10 of this Act * * * including interest at the rate of 6 per centum per annum from the date of taking the property to the date of payment therefor * * *." It is beyond question that Congress could not limit the amount of just compensation to be paid to the amount of money appropriated. *Monongahela Nav. Co. v. United States, supra*. Therefore, the language quoted above must be interpreted as precatory rather than as mandatory. This interpretation should be applied to the language with respect to the interest rate as well as the language with respect to the appropriation limitation.

**24.** In awarding interest at the rate of 6 percent, the trial judge was influenced by the fact that in all but one of the just compensation awards made, whether by judgment or by executive action, relative to the takings generated by Pub.L. No. 90–545, the interest rate allowed as

Declaration of Taking Act, 40 U.S.C. § 258a, which is generally applicable to condemnees of the Federal Government, has set 6 percent as a floor on the rate of interest, and the rate of interest actually awarded may rise depending on the economic conditions occurring after the taking. *See United States v. Blankinship, supra.* In light of the policy favoring uniformity in the treatment of condemnees with respect to the amount of just compensation awarded for a delay in payment, we construe Pub.L. No. 90–545 as establishing the same manner of treatment for redwood park condemnees as that for other condemnees.

The keystone to defendant's argument in favor of limiting the rate of interest to 6 percent is its analogy of plaintiffs' situation to a person who has bought a Government obligation in 1968 at the then current interest rate of 6 percent.[25] This analogy has several flaws. No reasonable investor would purchase an obligation with both an uncertain date of maturity and an uncertain amount of principal payable at maturity. Plaintiffs had their business property involuntarily converted into an extremely illiquid claim against the United States. Since plaintiffs' options for other investments were effectively cut off, just compensation in this case should include payments for delay of compensation measured by the interest rates prevailing between the taking and payment dates. The Government, not the unwilling condemnee, should be the one to bear the risk of any fluctuations in interest rates.

 Finally, the trial judge noted that the awarding of interest as part of just compensation is to compensate plaintiffs for defendant's delay in payment. Since the

amount awarded by the trial judge was closer to the amount urged by defendant than to the amount requested by plaintiffs, the trial judge suggested that the blame for the delay in payment could not be placed solely on the shoulders of defendant. It was improper for the trial judge to consider the relative merits of the parties' arguments as a basis for setting the rate of interest by which to measure the amount of just compensation to be awarded for the delay in payment. If the amount of just compensation for delay in payment is properly set, the effect of any delay in payment should be approximately neutral with respect to both parties. It is constitutionally required that plaintiffs must receive an amount sufficient to produce the full equivalent of the value paid contemporaneously with the taking. *United States v. Klamath and Moadoc Tribes,* 304 U.S. 119, 123, 58 S.Ct. 799, 801, 82 L.Ed. 1219 (1938). Conversely, the benefit accruing to defendant through the delay in payment should be approximately cancelled by the additional amount payable because of the delay. The imposition of a fair rate of interest on defendant as part of an award of just compensation should not be viewed as a penalty for a wrongful delay of payment. Defendant is required to compensate condemnees for even reasonable delays in payment such as the delay caused if an appraisal is necessary after the taking for defendant to make a fair offer of payment. On the other hand, the award of less than a fair rate of interest to plaintiffs must be viewed as an impermissible interference with the exercise of their right to a judicial determination of the amount of just compensation.

---

part of the just compensation awards was 6 percent. *See Kelly v. United States,* 209 Ct.Cl. 706, 708 (1976); *Simonson Lumber Co. v. United States,* 208 Ct.Cl. 1026, 1027 (1976); *Rocca v. United States,* 205 Ct.Cl. 275, 303, 500 F.2d 492, 508 (1974); 205 Ct.Cl. 885–86 (1975); *Van Voorhis v. United States,* 200 Ct.Cl. 755, 756 (1973). The one exception was *Arcata Nat'l Corp. v. United States,* 206 Ct.Cl. 819, 820 (1975), where the parties stipulated to a 6.6-percent rate of interest in settlement. Although our award of a higher rate of interest to

plaintiffs in this case creates a lack of uniformity in this respect, it is more important to establish a basis on which all condemnees who seek uniform treatment may receive it. The present plaintiffs cannot be penalized because most other redwood park condemnees did not pursue the interest issue.

**25.** A similar argument was made by defendant and rejected by the court in *Pitcairn v. United States, supra,* 212 Ct.Cl. at 193–97, 547 F.2d at 1122–24.

This court has previously established in *Pitcairn v. United States, supra,* and *Tektronix, Inc. v. United States, supra,* the rates of interest to be paid on just compensation claims for the years 1947 through 1975. These rates were fixed based on the trends indicated by Moody's Composite Index of Yields on Long Term Corporate Bonds. A rate of 6½ percent was determined as proper for the period 1968–70, and 7½ percent is payable for the period 1971–75. The rates set by the court approximated the yields on long-term corporate bonds rated Aaa as reported by Moody's, but they were slightly less than such yields since no one index of interest rates can be considered as controlling the rate of just compensation due for a delay in payment.[26]

Plaintiffs have requested just compensation for delay in payment at the annually fluctuating bond rates reported by Moody's. No variance from the interest rates set in *Pitcairn* and *Tektronix* for the years up through 1975 can be made for plaintiffs. This court is bound both by our prior decisions and the above-mentioned policy favoring uniform treatment of condemnees with respect to the amount of just compensation for delay of payment. For the years up through 1975, plaintiffs are therefore entitled only to the *Pitcairn* and *Tektronix* rates on the amount of the judgment and to the difference (to the date of payment) between these rates and the 6-percent interest paid to plaintiffs in 1971 on the sum of $11,687,955, which they accepted in that year.[27]

With respect to the years after 1975, the court stated in *Tektronix,* 213 Ct.Cl. at 274, 552 F.2d at 352–53, that the 7½-percent rate set for the period 1971–75 should continue to be applied to subsequent years until it was affirmatively demonstrated that under the theory of the *Pitcairn* opinion a different rate should be utilized. Plaintiffs, without objection from defendant, have requested this court to take judicial notice of Moody's index for the years 1976–79.[28] Applying an analysis similar to that employed in *Pitcairn,* we conclude that a rate of 8½ percent would be appropriate for the years 1976–79. For the year 1980 to the date of payment, we approve a rate of 12 percent. Since this is only for a short period of time, the 1980 rate here allowed will not be regarded by the court as a precedent for other cases.

V

■ Plaintiffs contend they are entitled to recover litigation expenses because of the proceedings in this court under the provisions of the Uniform Relocation Act, *supra.* Past decisions of this court, in redwood taking cases, have clearly held that plaintiffs are not entitled to recover litigation expenses for the legislative taking of their property. *Rocca v. United States,* 205 Ct.Cl. 275, 281–84, 500 F.2d 492, 495–97 (1974); *see Kelly v. United States,* 209 Ct.Cl. 706, 709 (1976); *Simonson Lumber Co. v. United States,* 208 Ct.Cl. 1026, 1027 (1976). Plaintiffs ignore the above decisions of the court.[29] Moreover, plaintiffs'

---

**26.** The exact rates as reported by Moody's were: 1968, 6.18 percent; 1969, 7.03 percent; 1970, 8.04 percent; 1971, 7.39 percent; 1972, 7.21 percent; 1973, 7.44 percent; 1974, 8.57 percent; and 1975, 8.83 percent.

**27.** The total sum of $11,687,955 was paid to plaintiffs on two separate dates, $7,906,900 in land and standing timber thereon was transferred to plaintiffs on August 31, 1971, together with 6 percent to that date. $3,781,055 in cash, plus 6-percent interest, was later paid to plaintiffs on October 31, 1971.

**28.** The rates for long-term corporate bonds rated Aaa were: 1976, 8.84 percent; 1977, 8.02 percent; 1978, 8.53 percent; and 1979, 9.63 percent.

**29.** Plaintiffs' reliance on the majority opinion in *United States v. 1,380.09 Acres of Land (Bodcaw Co.),* 574 F.2d 238 (5th Cir. 1978), which allowed recovery of appraisal expenses in a condemnation case is clearly misplaced. That decision was summarily reversed by the United States Supreme Court on February 26, 1979, *United States v. Bodcaw Co.,* 440 U.S. 202, 99 S.Ct. 1066, 59 L.Ed.2d 257 (1979). It seems well settled now that recovery of litigation expenses under the Uniform Relocation Act is appropriate only in *inverse* condemnation cases and is not appropriate in condemnation cases or in cases where property is legislatively taken.

argument for an interpretation of the Uniform Relocation Act that would support recovery by them of litigation expenses is most unpersuasive in light of the *Rocca* decision.

## CONCLUSION OF LAW

The court concludes as a matter of law that plaintiffs are entitled to recover from defendant for the taking on October 2, 1968, by defendant of plaintiffs' land, with improvements and standing timber thereon, the total sum of $13,900,257.80, less the sum of $11,687,955 heretofore paid plaintiffs. The court further concludes that plaintiffs are not entitled to recover severance damages as a result of the taking of their lands, and are not entitled to recover attorney, appraisal, and litigation fees actually incurred by plaintiffs because of the proceedings in this case. Judgment is hereby rendered for plaintiffs in the amount of two million two hundred twelve thousand three hundred two dollars and eighty cents ($2,212,302.80). As a part of just compensation plaintiffs are also entitled to recover interest on the amount of this judgment and on the sum of $11,687,955, up to the dates that this sum was paid in 1971, at the rate of 6½ percent per annum from October 2, 1968, to December 31, 1970, 7½ percent per annum from January 1, 1971, to December 31, 1975, 8½ percent per annum from January 1, 1976, to December 31, 1979, and 12 percent per annum from January 1, 1980, to the date of payment, less interest heretofore paid to plaintiffs with respect to the sum of $11,687,955.

It is further provided that plaintiffs may obtain payment of any such award allowed by judgment herein only upon tender of a deed to such property as is covered by said judgment in such form as the Attorney General may deem necessary to assure the defendant a valid fee simple title to the specifically designated lands taken from plaintiffs.